**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MELVYN KLEIN, Derivatively On Behalf Of HEALTH INSURANCE INNOVATIONS, INC., | Case No. |
| Plaintiff, | |
| v. | |
| GAVIN T. SOUTHWELL, MICHAEL W. KOSLOSKE, PAUL E. AVERY, ANTHONY J. BARKETT, PAUL GABOS, ROBERT MURLEY, BRUCE TELKAMP, SHELDON WANG, and MICHAEL D. HERSHBERGER, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| HEALTH INSURANCE INNOVATIONS, INC., | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Melvyn Klein ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Health Insurance Innovations ("Health Insurance Innovations" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Health Insurance Innovations with the U.S. Securities and Exchange Commission ("SEC"), press

releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Health Insurance Innovations against certain of its officers and directors seeking to remedy Defendants' (defined below) violations of state and federal law and have caused substantial harm to the Company.

2.      Defendants caused the Company to make materially misleading statements that: (a) the Company had unsuccessfully applied for its critically important third-party administrator ("TPA") license ("TPA Application") with the Florida's Office of Insurance Regulation ("FLOIR") due to, *inter alia*, the state's discovery of undisclosed legal actions against the Company insiders; (b) the Company privately warned FLOIR of the anticipated "domino effect" that the rejection would cause, by which the Company would subsequently either lose or be denied licenses in other states; (c) the Company was omitting material information from FLOIR and disregarding FLOIR's instructions to complete the TPA Application; (d) the TPA license denial was substantially harming the Company's ability to conduct its core business operations; (e) the Company had been accused of fraud by insurance regulators in Montana, and had suffered negative regulatory actions there as a result of the Company's misconduct; and (f) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

3.      The Company was founded by Michael W. Kosloske ("Kosloske") in 2008.  The Company went public via an initial public offering ("IPO") in February 2013, and its securities trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "HIIQ."   The

Company develops, distributes and administers short-term medical plans, hospital indemnity plans, and what the Company's filings with the SEC refer to as supplementary products such as pharmacy benefit cards, dental plans, vision plans, and life insurance policies.  The Company markets its products through an "internal distribution network" as well as an "external distribution network consisting of independently owned and operated" call centers.  The Company describes its target market as the large and under-penetrated segment of the U.S. population who are uninsured or underinsured.

4.    A third-party administrator ("TPA") is an organization that processes insurance claims or certain aspects of employee benefit plans for a separate entity.  The Company's Florida TPA Application, as well as its undisclosed compliance failures in other states, lies at the heart of this action.  The Company initially filed its Florida TPA Application on July 18, 2016.

5.    As the Company's Florida TPA application proceeded from its initial filing on July 18, 2016 to its ultimate denial on June 1, 2017, the Company simultaneously faced other regulatory scrutiny related to its core business operations outside of Florida.  Indeed, since 2016, the Company has come under intense public scrutiny for its relationships with third-party call centers, as consumers and state regulators have alleged that call center sales agents have made false or deceptive representations to sell the Company's short-term insurance policies.

6.    The Company is under investigation for allegedly fraudulent business practices by forty-two (42) states, involving credible allegations of serious misconduct.  According to the Company's filings with the SEC: "[t]he Indiana Department of Insurance is serving as the managing participant of the multistate examination, and the examination includes, among other things, a review of whether [ ] the Company has engaged in any unfair or deceptive acts or non-

compliant insurance business practices. At present, forty-two states have joined the multistate examination."

7.       Some of these state investigations have already culminated in public accusations of fraud and deception against the Company. On March 28, 2016, for instance, the Arkansas Insurance Department issued a press release titled: "[f]raudulent practices alleged against Florida company" that announced a Cease and Desist Order again the Company.  The Company was specifically accused of "intentionally misrepresenting the terms of an insurance contract or application for insurance" and using "fraudulent and dishonest practices in attempting to sell short-term health care plans" – *i.e.*, the Company's core business operation.

8.       Separately, on May 9, 2016, the Office of the Montana State Auditor, Commissioner of Securities & Insurance filed an action against the Company for "routinely" selling insurance policies "through misinformation and deception," and characterized the Company's misconduct as a "scheme" to defraud Montana's residents.

9.       As a consequence, the Company's license to operate in Montana has been suspended since the Cease and Desist Order against it was entered in May 2016.

10.       Then, on July 20, 2016, the Company disclosed that:

> In addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas, Florida, Kansas, Montana, Ohio, South Dakota, and Massachusetts, are reviewing the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by the Company.

11.       In an effort to reassure the market, and despite failing to disclose the sanctions against it in Montana and Arkansas in the July 20, 2016 Form 8-K, the Company added that it was "proactively communicating and cooperating with all applicable regulatory agencies, and [Defendant] Southwell, with his strong skills and experience with insurance regulatory matters, will lead the Company's efforts in responding to and addressing any such regulatory matters."

12.     Two days before the Company's disclosure, the Company submitted its Florida TPA Application on July 18, 2016.  Unbeknownst to the market, however, by July 25, 2016, FLOIR had already "deemed that application incomplete and returned it" to the Company.  The Company thereafter reapplied for its TPA License with FLOIR on October 28, 2016.

13.     On November 18, 2016, and for the first time since the Company went public in 2013, David Hershberger ("Hershberger") (the "Company's CFO) adopted a 10(b)(5)-1 stock trading plan.  He and other insiders did so in an attempt to conceal the illicit nature of their stock sales.  Between November 17, 2016 and November 21, 2016, while the Company's share price was artificially inflated, Hershberger sold 39,500 shares of his personally-held common stock – about one-fifth of his holdings.

14.     On November 28, 2016, FLOIR sent the Company a clarification letter seeking additional material information that the Company had omitted from their TPA Application with a response date of December 5, 2016.  On December 1, 2016, the Company requested an extension until December 12, 2016 to respond.  FLOIR granted the Company's request.  Inexplicably, and despite the material importance of the Company's TPA Application to the Company's business operations in Florida and across the country, particularly in light of Florida's investigation into the Company's "unlicensed sale of insurance by third-party distributor call centers," the Company failed to timely file its response by December 12, 2016.

15.     On December 16, 2016, the Company admitted in a private letter to FLOIR that it had failed to timely reapply and "requested an unspecified extension of time to gather the remaining information."  As described in a subsequent June 1, 2017 letter from FLOIR to the Company, "[t]hat same day [December 16, 2016], with no action form the Office granting or denying the request for an extension of time, Applicant withdrew the application."

16.     In response to the Company's withdrawal, FLOIR advised the Company in a letter dated December 16, 2016 that "until your application has been approved by the office and the appropriate licensure issued, the referenced company should not transact business that requires such license in this state."  The Company failed to disclose this profoundly negative material development to its shareholders in any of its SEC filings.

17.     Defendants caused the Company to willingly withdraw their key TPA Application with FLOIR due to their by-then legitimate concern that the Company's TPA Application would be denied.  Relatedly, Defendants also knew that the denial of their TPA Application would have, in the Company's publicly-undisclosed words, "grave attendant consequences" for the Company's operations both in and beyond Florida.  Rather than risk an outright denial by FLOIR – something Defendants knew they would have to disclose to insurance regulators in other states – Defendants instead voluntarily withdrew their TPA Application.  Defendants, however, failed to make any contemporaneous public disclosure to its shareholders regarding this negative material development.

18.     Just a short time after Defendants privately withdrew the Company's TPA Application in December 2016, the Company filed a Final Prospectus on Form 424B3 with the SEC on March 8, 2017 to enable Defendant Kosloske and entities he controlled to sell shares of the Company's artificially-inflated stock to the public (the "Secondary Offering"). According to the Company: "[a]ll such shares were offered and sold by … entities owned and controlled, directly and indirectly, by Michael Kosloske, the founder, Chief of Product Innovation, and a director of the Company.  The selling stockholders will receive all of the net proceeds from the offering.  The Company did not sell any shares in the offering."

19.     Defendant Kosloske thereafter sold three million shares of his personally held common stock – or 43.8% of his total holdings – in the Secondary Offering, pocketing nearly $40 million from his suspiciously-timed insider transaction.  The Company's shares fell almost 10% on March 8, 2017 in response to the announcement that Defendant Kosloske – the Company's own founder – was selling nearly half of his Company shares.

20.     A March 8, 2017 article published on the *Motley Fool* about the Secondary Offering partial fraud disclosure entitled, "Why Health Insurance Innovations Is Tumbling 10% Today," reported that "[o]n March 7, management updated investors on plans by the company's founder, Mike Kosloske, to sell 3 million shares of Class A stock in the company through a secondary offering. The offering was priced at $14 per share and none of the proceeds of this offering will go to the company.  Kosloske moved from the CEO role to the executive chairman role at Health Insurance Innovations in 2015."  Market analysts covering the Company later justifiably identified Defendant Kosloske's massive sale as a key risk factor facing the Company.

21.     Just a short time after the Secondary Offering, the Company refiled its TPA Application with FLOIR on April 19, 2017.  The application appeared to be untimely because, in a December 16, 2016 email from FLOIR to the Company, FLOIR informed the Company that it could reapply without submitting new paperwork or fees "[s]o long as the application is submitted within 60 days from December 16, 2016 [*i.e.*, February 14, 2017]."

22.     Before FLOIR had made any decision regarding the renewed TPA Application, however, the Company filed a Registration Statement on Form S-3, effective May 19, 2017 ("2017 Registration Statement"), to offer and sell up to $150 million of any combination of debt securities, Class A Common Stock, Preferred Stock, Warrants, Units or Purchase Contracts to the unsuspecting public while the Company's share price remained artificially inflated.

23.     Just two weeks after filing the Registration Statement, the Company received devastating news.  In a private letter from FLOIR to the Company sent June 1, 2017, the Company was informed that the Company's TPA Application had been "DENIED."  The bases for the denial included, *inter alia*, FLOIR's findings that the Company's application "contained numerous, material errors and omissions" and that the Company was "not competent."

24.     The denial also noted that the Company had misrepresented biographical information regarding Hershberger and Kosloske by failing to disclose "civil actions [against them] involving dishonesty, breach of trust, or financial dispute[s]…"  The June 1, 2017 FLOIR denial also noted that the Company "has submitted a new application filing for review three times over eight months, has been provided two separate sets of clarification letters, and has been granted numerous extensions of time to submit supplemental responses."  The Company concealed these highly material developments from its shareholders for two months when the Company finally, but incompletely, acknowledged the FLOIR denial in their August 4, 2017 Quarterly Report on Form 10-Q.

25.     In a written letter to FLOIR dated June 16, 2017, the Company mischaracterized FLOIR's denial as merely a "notice proposing to deny" the Company's TPA application. In that same letter, the Company complained that the denial of its application would require the Company to report this event to other states where it operated.  In the Company's own words, this would then trigger a "domino effect" which could result in its losing licenses in the other states. According to the Company, therefore, the consequences of the Florida TPA license denial could be catastrophic.  The Company concealed this letter and its contents from its shareholders.

26.     More specifically, the Company's June 16, 2017 written appeal to FLOIR privately acknowledged the disastrous effects the denial would have on the Company's operations, writing:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [the Company] would seek to pursue any form of insurance related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement.

Defendants caused the Company to deliberately conceal these highly material negative facts from its own shareholders.

27.     On August 4, 2017, the Company filed its Quarterly Report on Form 10-Q with the SEC ("2Q 2017 Report") which Southwell and Hershberger signed.  While the 2Q 2017 Report finally disclosed that FLOIR had denied the Company's key TPA Application, that disclosure was itself materially misleading because it failed to also reveal to investors the potentially devastating consequences Defendants contemporaneously knew the denial could have on the Company's operations.  The Company therefore deliberately understated the scope of those negative material developments to its shareholders and did so in a manner Defendants knew would mislead the market.

28.     On September 1, 2017, Southwell and Hershberger – who had signed the 2Q 2017 Report disclosing the denial by FLOIR just weeks earlier – both personally executed a "Declaration and Certification" under penalty of perjury with the Illinois Department of Insurance misrepresenting that the Company had never  been "refused" a TPA license, and that a "license to act as such" had never been denied "in any state."  Given the TPA Application denial by FLOIR that Hershberger and Southwell disclosed in the 2Q 2017 Report just weeks earlier, this representation was false when made and Hershberger and Southwell knew it.

29.     Finally, on September 11, 2017, a whistleblower report about the Company called "Health Insurance Innovations: Penalties to Exceed $100 Million and Undisclosed Domino Effect" was published on *Seeking Alpha* publicly-disclosing for the first time that, *inter alia*, "HIIQ privately warns of disastrous 'domino effect' spreading to other states, causing additional loss of license.  HIIQ makes no disclosure to investors."

30.     Upon the release of this and related news, the Company's share price fell $6.55 per share, from a closing price of $29.90 per share on September 8, 2017 to a close at $23.35 per share on September 11, 2017 on massive volume of 9,454,100 shares traded that day – a drop of approximately 21.91%.  As the market continued to digest the negative news the following day, the Company's share price fell an additional 15.4% on September 12, 2017, again on massive trading volume as depicted in the chart below:



## JURSIDICTION AND VENUE

31.    Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b), 20(a) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

32.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

33.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

34.    ***Plaintiff Melvyn Klein*** is a current owner of Health Insurance Innovations stock and has held the stock during the time of Defendants' continuous wrongful course of conduct

alleged herein.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

35.     Defendant Health Insurance Innovations is a Delaware corporation with its principal place of business in with its principal executive offices at 15438 N. Florida Avenue, Suite 201, Tampa, FL 33613.  The terms "HII", "HPIH", and "ICE" refer to the stand-alone entities Health Insurance Innovations, Inc., Health Plan Intermediaries Holdings, LLC, and Insurance Center for Excellence, LLC, respectively. The Company's common shares trade on the NASDAQ under the ticker symbol "HIIQ."

**Director Defendants**

36.     ***Defendant Gavin T. Southwell*** ("Southwell") has served as the Company's President since July 2016, and as its Chief Executive Officer ("CEO") and member of the Board of Directors (the "Board") since November 2016.   The Company's filings with the SEC represented that Southwell's detailed knowledge and extensive insurance background, including that having worked in senior executive positions for a broker, managing general underwriter, insurer and reinsurer, "makes him a valuable member of the Board."

37.     Southwell signed the Company's materially false and misleading:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2016 that the Company filed with the SEC on March 2, 2017 ("2016 Annual Report");

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2017 that HIIQ filed with the SEC on May 4, 2017 (the "1Q 2017 Report");

- Registration Statement on Form S-3 that the Company filed with the SEC on May 5, 2017 ("2017 Registration Statement"); and

- Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2017 that the Company filed with the SEC on August 4, 2017 (the "2Q 2017 Report").

38.    **Defendant Michael W. Kosloske** ("Kosloske") founded the Company.  He serves as the Company's Chief of Product Innovation and as a Company director and was Board Chair from 2012 to 2016.    Previously, Kosloske served as the Company's President and Chief Executive Officer since the Company began operations in 2008 until 2015, and as Chairman from 2012 to 2016.  Kosloske is married to the Company's Chief Broker Compliance Officer, Lori Kosloske. Kosloske signed the materially false and misleading 2016 Annual Report and 2017 Registration Statement.

39.    **Defendant Dr. Sheldon Wang** ("Wang") has served as the Company's Chief Technology Officer since 2014, and as a director since May 2017.  During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Wang sold 155,882 Company shares on inside information, for which he received over $3.2 million and made no purchases of Company stock:

40.    **Defendant Bruce Telkamp** ("Telkamp") has served as CEO of the Company's Consumer Division and CEO of HealthPocket, Inc., a Company subsidiary, since May 2015.  He also served as a Company director from April 2016 to May 2017.  During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Telkamp sold 273,775 Company shares on inside information, for which he received over $5.7 million and made no purchases of Company stock.

41.  **Defendant Paul E. Avery** ("Avery") has served as a Company director since 2013.

42.  **Defendant Anthony J. Barkett** ("Barkett") has served as a Company director since 2013 and is a member of the Audit Committee.

43.  **Defendant Paul Gabos** ("Gabos") has served as a Company director since 2013, Chairman on the Board since November 2016, and is the Chairman of the Audit Committee.

44.  **Defendant Robert Murley** ("Murley") has served as a Company director since 2014 and is a member of the Audit Committee.  During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Murley sold 10,000 shares of Company stock on March 9, 2017, from which he benefited in the amount of approximately $158,210. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

45.  Defendants Southwell, Kosloske, Wang, Telkamp, Avery, Barkett, Gabos, and Murley are collectively referred to herein as the "Director Defendants".

**Officer Defendants**

46.  **Defendant David Hershberger** ("Hershberger") has served as the Company's Chief Financial Officer ("CFO") since September 2016.  Hershberger signed the Company's materially false and misleading:

- Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2016 that HIIQ filed with the SEC on November 3, 2016 (the "3Q 2016 Report");

- Press release on Form 8-K that the Company filed with the SEC on March 2, 2017;

- Final Prospectus Supplement on Form 424B3 that the Company filed on March 8, 2017;

- 2016 Annual Report;

- 1Q 2017 Report;

- 2017 Registration Statement;

- 2Q 2017 Report; and

- Press release on Form 8-K that the Company filed with the SEC on August 3, 2017.

47. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Hershberger sold 112,269 Company shares on inside information, for which he received approximately $2.1 million and made no purchases of Company stock.

48. Defendants Southwell, Kosloske, Wang, Telkamp, Avery, Barkett, Gabos, Murley and Hersgberger are collectively referred to herein as the "Defendants".

### THE COMPANY'S CORPORATE GOVERNANCE

49. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

50. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

51.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

52.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

53.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

54.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of

the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

55.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

#### 1.    The Company's Business Model

56.    The Company is a Delaware company.  It is a holding company whose sole asset is a 35% stake in the "aggregate membership interests" of Health Plan Intermediaries, Holdings LLC ("HPIH"). "Health Insurance Innovations, Inc." is also registered as a fictitious name of HPIH.

57.    Health Insurance Innovations describes itself as a "developer and administrator" of individual health plans and ancillary products, who "design[s] and structure[s] insurance products on behalf of insurance carrier companies" and "market[s] them to individuals."   Health Insurance Innovations targets "the large and under-penetrated segment of the U.S. population who are uninsured or underinsured," which includes "new graduates, divorcees, early retirees, military discharges, the unemployed, part-time and seasonal employees and temporary workers."

58.     A distribution network of Health Insurance Innovations-owned websites and around 100 third-party call centers sell insurance products underwritten by insurance companies. Health Insurance Innovations collects payments from customers on behalf of insurance companies and remits commissions to the third-party call center that sold the customer the policy.   Health Insurance Innovations also acts as a third-party administrator ("TPA") that functions as a middleman between health insurers and customers looking for affordable health insurance plans. The short-term medical policies, ancillary insurance, and health benefit plans Health Insurance Innovations administers are sold outside of the Affordable Care Act ("ACA") marketplace, and therefore are not considered qualifying health coverage under the ACA.

59.     The Company markets "affordable alternatives" to health plans available on the government exchanges.  Because these products are sold outside the ACA marketplaces, they do not have to comply with many key ACA regulations.  For instance, they are not required to comply with the ACA's requirement to cover preexisting conditions.  To the extent that some states may require some coverage of pre-existing conditions, Health Insurance Innovations has promised investors that their customer base "substantially [] has no covered pre-existing conditions."

60.     A customer can purchase a Health Insurance Innovations-administered policy via one of two channels: (a) through a call center; or (b) on a website owned by the Company.  The customer then pays premiums and an enrollment fee to Health Insurance Innovations, which transfers the premium payment to the underwriting insurer and keeps the enrollment fee.  Health Insurance Innovations also pays the commission to the agent who sold the policy, which originates from the underwriting insurer.   Health Insurance Innovations advances the

commission to the third-party call center in the form of a secured loan (below is a diagram of the relationship):



61.    At all relevant times, the Company acknowledged that "state regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to each state."

62.    Health Insurance Innovations sought and obtained licenses to operate as a third-party administrator from a number of states long before it did so in Florida. For instance, it applied for a TPA license in the state of Illinois in 2012, wherein it disclosed that it was not licensed it in its home state of Florida. Health Insurance Innovations did not seek a TPA license from the state of Florida, where the business is headquartered, until July of 2016.

63.     Health Insurance Innovations went public pursuant to an IPO on February 7, 2013. Prior to the IPO, on December 6, 2012, the SEC informed the Company that "[i]t is not appropriate to imply that you are not liable for statements included in your registration statement. Please delete these statements or specifically state that you are responsible for the referenced information."   The SEC was concerned that the Company's draft prospectus inappropriately represented that the Company was not responsible for some of the information it presented as follows:

> This prospectus includes industry and market data that we obtained from periodic industry publications, third-party studies and surveys, filings of public companies in our industry and internal company surveys.  These sources include government and industry sources. Industry publications and surveys generally state that the information contained therein has been obtained from sources believed to be reliable.  Although we believe the industry and market data to be reliable as of the date of this prospectus, this information could prove to be inaccurate. Industry and market data could be wrong because of the method by which sources obtained their data and because information cannot always be verified with complete certainty due to the limits on the availability and reliability of raw data, the voluntary nature of the data gathering process and other limitations and uncertainties. In addition, we do not know all of the assumptions regarding general economic conditions or growth that were used in preparing the forecasts from the sources relied upon or cited herein.

64.     On December 12, 2012, the Company acknowledged its attempted sleight of hand and informed the SEC that the "Company acknowledges the Staff's comment and has deleted these statements."

**B.      The Company Has Been Repeatedly Accused of**
     **Making False and Misleading Statements to State Regulators**

     **1.      Beyond Florida**

65.     At all relevant times, the Company has misleadingly represented to the market that it had market-leading compliance.   However, and as set forth herein, the Company's

compliance failures with state regulators has harmed the Company, its prospects and damaged Company shareholders.

66.     On March 28, 2016, the Arkansas Insurance Department ("Arkansas") issued a press release entitled: "[f]raudulent practices alleged against Florida company" that announced a Cease and Desist Order against the Company.   Arkansas accused the Company of "intentionally misrepresenting the terms of an insurance contract or application for insurance" and using "fraudulent and dishonest practices in attempting to sell short-term health care plans" – namely, the Company's core business operations.   The press release announcing the Cease and Desist Order is stated below:

**PUBLISHED:** March 28, 2016

# Kerr Issues Cease & Desist Order

## Fraudulent practices alleged against Florida company selling health plans to Arkansans

**LITTLE ROCK –** Arkansas Insurance Commissioner Allen Kerr today released the following statement regarding a Cease and Desist Order issued against Health Plan Intermediaries Holdings, LLC., dba Health Insurance Innovations (HII), a Tampa, Florida-based company, over allegations the company has used fraudulent and dishonest practices in attempting to sell short-term health care plans to Arkansans, claiming the plans were compliant with the Affordable Care Act:

"The Arkansas Insurance Department takes very seriously its charge to protect Arkansas consumers from fraud.  We will not allow unlicensed individuals to prey upon our neighbors with non-compliant health insurance plans under the promise of avoiding a tax penalty."

The Cease and Desist Order requires HII and its affiliates to immediately stop the sale, solicitation, or advertising of any health plans or medical insurance using unlicensed agents, and stop intentionally misrepresenting the terms of an insurance contract or application for insurance.  The order can be **read here**.

AID investigators engaged in a phone call with an HII employee who offered insurance plans, and provided price quotes for HII products, despite admitting he was not a licensed insurance agent. Additionally, several company representatives made misleading statements to investigators about two HII short-term health plans, "HealtheFlex" and "Principal Advantage Plan," that they were ACA-compliant plans that would allow a consumer to avoid receiving a tax penalty.

67.     On May 9, 2016, the Company was issued a temporary Cease and Desist Order by the State of Montana, which directed the Company to "cease and desist from selling negotiating,

transacting, administering, or otherwise take part in or benefit from any insurance transaction in, to, or from Montana, or attempt to do any of the same."   The Company's health insurance producer license has been suspended in Montana since the time of Montana's action against it, and the Company is currently not permitted to operate there.

68.     In a Notice of Proposed Hearing issued the same day as the Cease and Desist Order, the Office of the Montana State Auditor alleged that the Company entities "enrolled thousands of Montanans in short term medical plans, and [the Company] received at least $449,000 in administrative fees and another $54,000 in premium [between January 1, 2012 and April 20, 2015]" and that "[n]one of the [the Company] entities have ever been certified as administrators in Montana, or have requested or received waiver of the certification requirement."

69.     Throughout the Montana action, the Montana State Auditor refers to the Company's fraud as "the HII scheme."   The Montana fraud complaint also specifically highlighted the Company's role in the scheme, without any mention of the "two dozen" other entities misleadingly emphasized by the Company in its SEC filings to downplay the significance of these regulatory sanctions against it:



70.     The following month, on June 8, 2016, the Commissioner of the Indiana Department of Insurance issued an Examination Warrant to the Company indicating that the Market Actions Working Group of the National Association of Insurance Commissioners had accepted a request for a review of "[the Company] sales, marketing and administration of short term medical plans and ACA plans" between March 23, 2010 through April 30, 2016.  That review was to be conducted in conjunction with a multistate examination of HCC Life Insurance Company, one of HIIQ's previously affiliated insurers.

71.     Then, in September 2016, the Company filed an application to renew its third-party administrator license in Illinois.  The application specifically asked whether the Company had ever been "refused a license to act as a Third Party Administrator, agent, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?"  Despite the fact

that Montana had suspended the Company's license just six months prior – Hershberger signed his name to an application under penalty of perjury indicating that the answer was "no."

72.     On October 31, 2016, the Company filed an application for a third-party administrator license with the Montana CSI. There, Southwell and Hershberger signed notarized affidavits stating that, to their knowledge, they had never been an officer of a company that "[h]ad its permit, license, or certificate of authority suspended, revoked, canceled, non-renewed, or subjected to any judicial, administrative, regulatory, or disciplinary action . . ." Notably, Kosloske answered the question affirmatively, saying that he had been in such a position, but did not provide any details in the follow-up question asking for explanation.

73.     The attestations by Southwell and Hershberger were materially misleading because they were officers of the Company, which had been the subject of at least three (3) regulatory actions that year alone – including in the state of Montana.[1]

74.     On March 6, 2017, the commissioner of the Indiana Department of Insurance issued a Modified Examination Warrant to the Company that expanded the forty-two (42) state examination against the Company. The Modified Examination Warrant notified the Company that "the Examination is hereby modified to include a review of Health Insurance Innovation Inc., and its affiliates, parents, subsidiaries and assigns (collectively "HII")'s marketing, sales, administration and claims payment of insurance products for all insurance carriers, agencies, sub-agencies, agents, sub-agents, producers, contractors and other parties with whom HII conducted business."

75.     On September 1, 2017, the Company filed an application to renew its third-party administrator license in the state of Illinois. The application asked: "[h]ave you been refused a

---

[1]     While Hershberger signed his Affidavit on June 2, 2016 - *i.e.*, before the Indiana warrant was filed, he still would have been aware of the Montana and Arkansas actions.

license to act as a Third Party Administrator, agent, broker, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?"  Despite the fact that their license was still suspended in Montana and that they had recently been denied a license in their home state of Florida, Gavin, Southwell and Hershberger signed their names to an application indicating that the answer to this question was "no."

76.     As herein alleged, the Company's failure to provide the information requested was a deliberate attempt to delay the agency's scrutiny as well as mislead investors and state insurance regulators.

**2.     In Florida**

77.     The Company initially filed its Florida TPA Application on July 18, 2016.  On July 20, 2016, the Company revealed that it was under investigation in Florida for its "sales practices" and "unlicensed sale of insurance by third-party distributor call centers utilized by the Company." Subsequently, after Florida's Office of Insurance Regulation ("FLOIR") issued clarification letters seeking additional or missing information from the Company, on December 1, 2016, the Company requested an extension to respond until December 12, 2016.  FLOIR granted this request.

78.     The Company failed to timely respond.  Instead, on December 16, 2016, the Company acknowledged in a private letter to FLOIR that it had not yet responded to all the requests for clarification and requested another extension.  Later that day, the Company withdrew its application.  In response to the Company's withdrawal, FLOIR advised the Company in a letter dated December 16, 2016 that "until your application has been approved by the office and the appropriate licensure issued, the referenced company should not transact

business that requires such license in this state." The Company did not contemporaneously disclose the existence of this highly material order.

79.    FLOIR also advised the Company that its TPA Application could be effectively reinstated without incurring additional fees if the Company resubmitted its application within sixty days of December 16, 2016 (February 14, 2017).

80.    After the Company ultimately refiled its TPA Application on April 19, 2017, FLOIR denied it on June 1, 2017 deeming the Company "not competent," and finding that the Company "failed to correct errors or omissions in the application and did not supply additional information when requested by [FLOIR]."[2]    FLOIR's June 1, 2017 denial added that the Company's TPA Application errors and omissions were "material."  FLOIR also determined that the Company had attempted to mislead it by concealing lawsuits against Kosloske and Hershberger "involving dishonesty, breach of trust or a financial dispute."

81.    FLOIR also noted that over the "extended period" during which the Company submitted a new application filing three (3) times over an eight (8) month period, during which the agency provided two separate sets of clarification letters, the Company still failed to provide information the agency had repeatedly requested. The Company failed to provide details on the premiums collected and paid out by the insurance companies it worked with, and failed to provide information explaining its affirmative answer to the question asking if the Company had ever had a permit, license, or certificate of authority suspended, revoked or cancelled.

82.    The Company answered "no" in response to a question asking whether Kosloske had been a party to "any civil action involving dishonesty, breach of trust, or a financial dispute." When an independent audit by FLOIR revealed that he in fact had been named in two Florida

---

[2]    The Company was informed of the denial and the reasons for it by their outside counsel at Greenspoon Marder no later than June 4, 2017.

state actions, the Company still failed to provide information requested about their nature and final disposition.

83.     The Company also answered "no" in response to a question asking whether Hershberger had been a party in the last ten years to "any civil action involving dishonesty, breach of trust, or a financial dispute."   When a background report revealed that he had been named in two (2) Wisconsin state actions, the Company again failed to provide information requested about their nature and final disposition.

84.     In a June 16, 2017 letter to FLOIR purporting to appeal the denial of its TPA Application, the Company represented that it had TPA licenses in "over twenty states where such licensure is required" and complained that many states require license applicants to disclose if a license has been suspended, revoked or denied in another jurisdiction.   The Company added that: "to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     The Company's November 3, 2016 Materially Misleading Statements

85.     On November 3, 2016, Defendants caused the Company to file its 3Q 2016 Report with the SEC which Hershberger signed.   The 3Q 20116 Report represented that, as of the date it was filed: "[t]here were no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015, other than the following new risk factor . . ." The Company's 2015 Annual Report on Form 10-K was filed with the SEC on March 8, 2016

86.     The 3Q 2016 Report also stated that "[w]e are aware that several other states, including Arkansas, Florida, Kansas, Montana, Ohio, South Dakota, Texas and Massachusetts,

are reviewing the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by the Company . . . ."

87.     The statements alleged above were materially misleading when made because: (a) Defendants knew or deliberately disregarded that, between the filing of the 2015 Annual Report on March 8, 2016 and the filing on the 3Q 2016 Report on November 3, 2016, material developments had occurred regarding the Company's operations that did  pose a risk to investors, including the fact that the state of Montana had moved far beyond merely "reviewing" the Company's sales practices.

88.     In fact, in May 2016, the State of the Montana action accused the Company of engaging in "misinformation and deception" and entered a Cease and Desist Order against it requiring it to "immediately cease and desist from selling, negotiating, transacting, administering, or otherwise take part in or benefit from any insurance transaction in, to or from Montana . . . ." Moreover, the Cease and Desist Order summarily suspended all the Company's Montana insurance license pending a hearing.  On May 9, 2016, the Office of the Montana State Auditor, Commissioner of Securities & Insurance filed an action against the Company for "routinely" selling insurance policies "through misinformation and deception," and characterized the Company's misconduct as a "scheme" to defraud Montana's residents.

89.     The 3Q 2016 Report was also materially false and misleading because it contained a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Hershberger stating that the information contained in the 3Q 2016 Report was accurate.  Southwell was also aware of these negative material facts, because, on July 20, 2016, the Company represented that

"Southwell . . . will lead the Company's efforts in responding to and addressing any such regulatory matters."[3]

90.     Hershberger participated in an earnings call on November 3, 2016, to discuss the 3Q 2016 quarterly results.  At no time during that call did Hershberger disclose the existence of the negative developments in Montana.

**B.     The Company's March 2, 2017 SEC Filings
Contained Materially Misleading Statements**

91.     On March 2, 2017, Defendants caused the Company to file a press release with the SEC on Form 8-K reporting the Company's Fourth Quarter and Fiscal 2016 Financial and Operating Results ("March 2017 Form 8-K").  The March 2017 Form 8-K was signed by Hershberger.  Defendants either knew or deliberately disregarded that the March 2017 Form 8-K's "Regulatory Update" section was materially misleading because it failed to disclose that, in December 2016, the Company had withdrawn its Florida TPA application due to numerous failures on the Company's part to accurately complete it.

92.     Defendants either knowingly or with deliberate recklessness also failed to disclose in the March 2017 Form 8-K the material fact that, in response to the Company's withdrawal on December 16, 2016, FLOIR advised the Company that "until your application has been approved by the [FLOIR] and the appropriate licensure issued, the referenced company should not transact business that requires such license in this state."  Southwell was clearly aware of this negative material fact because, on July 20, 2016, the Company represented that "Southwell . . . will lead the Company's efforts in responding to and addressing any such regulatory matters."

---

[3]     In an August 9, 2016 earnings call, Hershberger announced that Southwell had been promoted to President saying that Southwell had a "significant amount of expertise" in state regulatory matters and would be "responsible for sales, marketing distribution and operations."

93. The March 2017 Form 8-K also represented that: "[i]n addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas, Florida, Kansas, Massachusetts, Montana, Ohio, South Dakota, and Texas are reviewing alleged non-compliance with sales practices, non-compliance with insurance laws, and/or unlicensed sale of insurance by third-party distributor call centers utilized by the Company."

94. On March 2, 2017, the Company also filed its Annual Report on Form 10-K for fiscal year 2016 with the SEC ("2016 Annual Report"). The 2016 Annual Report was signed by Southwell, Hershberger and Kosloske. Defendants represented that: "[i]n addition to the multistate examination, the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") has initiated an administrative action against us." While Defendants finally acknowledged the material fact that their license had been suspended in Montana (nine months after the fact), the 2016 Annual Report was materially misleading when made because Defendants either knowingly or with deliberate recklessness failed to disclose that the Montana CSI had accused the Company of engaging in a fraudulent "scheme" against Montana's residents.

95. Again, Southwell cannot credibly deny his knowledge of these negative, undisclosed material facts, because, on July 20, 2016, the Company represented that "Southwell . . . will lead the Company's efforts in responding to and addressing any such regulatory matters."

C.     **The Company's March 8, 2017 Prospectus
       Contained Materially Misleading Statements**

96. On March 8, 2017, Defendants caused the Company to file a Final Prospectus Supplement on Form 424B3 with the SEC announcing that the "selling stockholders identified in this prospectus supplement are offering 3,000,000 shares of our Class A common stock, which are to be issued upon the exchange of an equivalent number of Series B Membership Interests

(together with an equal number of shares of our Class B common stock) of Health Plan Intermediaries Holdings, LLC." The Company announced the pricing of the underwritten Secondary Offering at a price to the public of $14.00 per share which was expected to close on March 13, 2017.

97.    All shares in the Secondary Offering were offered and sold by entities owned and controlled, directly and indirectly, by Kosloske who received all of the net proceeds from the Secondary Offering. The Company did not sell any shares in the Secondary Offering. As the selling stockholder, Kosloske received all of the net proceeds from the offering. The Company's share price fell on March 8, 2017 to close at $15.65 from the prior day's closing price of $17.35 – a drop of 9.8% -- in response to the announcement of the Secondary Offering.

98.    The Prospectus was materially misleading because it incorporated by reference the materially misleading: (i) 2016 Annual report; and (ii) March 2017 Form 8-K. Southwell was also aware of these negative material facts, because, on July 20, 2016, the Company represented that "Southwell … will lead the Company's efforts in responding to and addressing any such regulatory matters."

**D.    The Company's May 4-5, 2017 SEC Filings**
**Contained Materially Misleading Statements**

99.    On May 4, 2017, Defendants caused the Company to file its Quarterly Report on Form 10-Q with the SEC for the quarterly period ended March 31, 2017 ("1Q 2017 Report") which Southwell and Hershberger signed.

100.    On May 5, 2017, Defendants caused the Company to file a Registration Statement on Form S-3, effective May 19, 2017 ("2017 Registration Statement"), to offer and sell up to $150 million of any combination of debt securities, Class A Common Stock, Preferred Stock, Warrants, Units or Purchase Contracts to the unsuspecting public. The 2017 Registration

Statement incorporated by reference the Company's materially false and misleading: (i) Annual

Report on Form 10-K for the year ended December 31, 2016 (as filed on March 2, 2017); and (ii)

Quarterly Report on Form 10-Q for the period ended March 31, 2017.

101.    Approximately one month after filing the Registration Statement, the Company

was informed on June 4, 2017 that its TPA Application had been denied by FLOIR on June 1,

2017 and the reasons for the denial.  The bases for the denial included, *inter alia*, the FLOIR's

conclusions that the Company's application "contained numerous, material errors and

omissions" and that the Company was "not competent."  The Company failed to immediately

report this material negative development in a Form 8-K under Item 8.01 (or otherwise) for

"events that … the registrant considers to be of importance to security holders."  Instead, the

Company waited to do so – and only partially – several months later in August 2017.

**E.      The Company's August 3-4, 2017 SEC Filings**
**        Contained Materially Misleading Statements**

102.    On August 3, 2017, Defendants caused the Company to file a press release on

Form 8-K with the SEC that Hershberger signed.  On August 4, 2017, Defendants caused the

Company to file its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended

June 30, 2017 ("2Q17 Report"), which Southwell and Hershberger signed.  Moreover, Southwell

and Hershberger executed certifications pursuant to the Sarbanes Oxley Act of 2002 attesting to

the accuracy of the 2Q17 Report.

103.    The 2Q17 Report represented in relevant part that:

Many states have statutes that require the licensure of third-party insurance
administrators ("TPA").  The statutes and applicable regulations vary from state-
to-state with respect to the nature of the business activities that may require
licensure.  Where the Company believes that statutes are unclear or open to
interpretation, it takes the prudent approach of applying for a TPA license.
Therefore, the Company applied for a TPA license with the Florida Office of
Insurance Regulation ("OIR").  In June 2017, the OIR denied the Company's

application based on its determination that the Company had not yet provided all information required to process the application.   In June 2017, the Company appealed the denial with the Florida Division of Administrative Hearings.   A final hearing on the matters has been scheduled for October 17-20, 2017, but the Company is working with the OIR to reach a mutually agreeable resolution of the matter prior to the hearing, including discussing whether the OIR will require the Company to hold such a license at all.

104.    Defendants either knew or deliberately disregarded that the statements above were materially misleading when made because they: (a) misrepresented the necessity of obtaining a TPA license by the Company in Florida, including the fact that in December 2016 FLOIR warned the Company that it "should not transact business that requires such license in this state"; (b) failed to disclose that the Company had already received TPA licenses in a number of jurisdictions – including in Indiana which required licensing in an applicant's home state – in the Company's case, Florida; and (c) that FLOIR had denied the Company's TPA Application because FLOIR determined that the Company had made material misstatements in its application and found it "not competent."

105.    In addition, the 2Q 2017 Report was materially misleading because Defendants either intentionally or with deliberate recklessness concealed the severe consequences of FLOIR's denial of the Company's TPA Application on the Company's operations and future prospects.   Also, the Company's August 3, 2017 Form 8-K was materially misleading because it failed to make any mention of the FLOIR denial which enabled the Company to conceal the denial during its subsequent August 3, 2017 conference call with analysts and investors. The Company's share price accordingly rose that day from an open of $28.90 per share to a close of $29.60 per share as a result of this concealment.

106.    In addition, while the Company stated in the 2Q 2017 Report that it had "appealed the denial" and that "the OIR denied the Company's application based on its determination that

the Company had not yet provided all information required to process the application," they deliberately failed to disclose that the Company's written appeal dated June 16, 2017 privately acknowledged that:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [the Company] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement.

107.     Even when questioned specifically about the Company's regulatory compliance status during the Company's August 3, 2017 earnings conference call with investors and analysts, Southwell failed to disclose the truth. There, analyst Richard Collamer Close asked Southwell to "go into more details" about the Company's "efforts on improved compliance," noting that "obviously, there you have outstanding litigation and I guess regulatory oversight here . . ." In response, Southwell misleadingly downplayed the regulatory issues the Company then faced as "a lot of noise . . . that comes from kind of historic items."  But there was nothing historic about the FLOIR rejection.  As evidenced by the desperate language contained in the Company's June 16, 2017 appeal to FLOIR and their misleading statements in the Illinois and Montana applications, the Florida rejection was a serious and imminent threat to the Company's operations and Southwell knew it as the person charged with leading the Company's efforts to address the Company's regulatory scrutiny.

108.     In sum, the 2Q 2017 Report was materially misleading because it misrepresented that: (a) the Company's critically important TPA license with FLOIR had been denied due to, *inter alia*, Florida's discovery of undisclosed legal actions against the Company insiders and finding that the Company was "not competent"; (b) the Company privately warned FLOIR of the anticipated "domino effect" that the rejection was likely to cause, by which the Company would

subsequently lose licenses in other states; (c) the Company had intentionally omitted material information and disregarded the FLOIR's instructions to complete the TPA Application; (d) the TPA license denial adversely affected the Company's other licenses and future license applications; (e) the denial was substantially harming the Company's ability to conduct its core business operations; and (f) as a result, the Company's public statements in the 2Q 2017 Report were materially false and misleading.

## DEFENDANTS' SALES OF COMPANY STOCK
## WERE SUSPICIOUS IN TIMING AND AMOUNT

109.    As a result of the intentional or deliberately reckless materially misleading statements and omissions alleged above, the Company's stock price soared from a low of $5.98 on November 8, 2016 to a high of $36.35 on August 31, 2017 – just two weeks before the truth about the misconduct was revealed in the September 11, 2017 *Seeking Alpha Report*.

110.    The Company's highest-ranking executive officers and directors sold aggressively, demonstrating their additional motive to commit fraud.  While some of these insiders – including Hershberger – established 10(b)(5)-1 trading plans, they also sold extensively outside of the scope of the suspiciously timed adoption of these trading plans.  At the time of the IPO, Hershberger was awarded 400,000 shares pursuant to the Company' long term incentive plan.  These shares were scheduled to vest: 20% on August 13, 2013; 20% on October 1, 2013, 20% on October 1, 2014; 20% October 1, 2015; and 20% October 1, 2016.

111.    A shell corporation in the IPO named "Health Plan Intermediaries Sub, LLC" was awarded 86,667 Class B Shares.  Kosloske is the sole member and primary manager of Health Plan Intermediaries, LLC ("HPI"), which is sole managing member of HPIS and has sole voting and dispositive power over the shares held by HPIS.  Further, according to the Company's filings with the SEC, these "shares of Class B common stock, together with the Series B Membership

Interests of HPI, are exchangeable, at Michael W. Kosloske's election, for equal number of shares of Class A common stock. This exchange right has no expiration date." In total, Kosloske acquired 8,666,667 shares of the Class B Common stock through HPI, LLC. If he executed such an exchange, Defendant Kosloske would control 65% of the Class A common stock.

112.   In July 2014, the Company acquired HealthPocket in exchange for $21.9 million and 900,900 shares of the Class A stock. Shortly after the merger, on August 15, 2014, the Company filed a prospectus for the sale of 1,725,000 shares the HPIH and HPIS subsidies Kosloske owned at a price of $12.15 per share. After the Company's IPO, no individual identified by the company[4] as a corporate insider sold any stock outside of a 105b-1 trading plan until March 8, 2016.[5]

113.   On July 20, 2016, the Company filed with the SEC a press release on Form 8-K announcing that the Company was the subject of a multistate examination and that several states had announced that they were investigating their sales practices and regulatory compliance. Prior to this disclosure, the Company filed its application for a TPA license with FLOIR on July 18, 2016. A few days later, on July 25, 2016, FLOIR rejected the Company's TPA license as incomplete.

114.   On November 18, 2016, Hershberger established his 10b5-1 trading plan. Between November 17 and 21, 2016, Hershberger sold 39,500 shares of Company stock – over one-fifth of his original holdings – for more than $400,000 in proceeds.

---

[4]   While the company provided trading information for Lori Kosloske on its website, her trades are not identified as "insider" trades on NASDAQ's website.

[5]   On that date, Kosloske disclosed that the Company had withheld 533 of his shares "to satisfy tax liability incident to vesting of restricted stock."

115.   On March 8, 2017, the Company filed the 2017 Registration Statement enabling Kosloske to sell three million shares of his Company common stock – almost half of his holdings – at an average price of $13.16 per share for a total of $39.48 million.

116.   On April 19, 2017, one hundred and twenty-four days after it withdrew its TPA Application in December 2016, the Company refiled it.  As part of its application, Southwell and Hershberger signed a notarized affidavit attesting that they understood Florida's statutory regulatory requirements regarding a company's responsibility to submit annual reports, financial statements, administrative agreements with health insurance companies, and notification of class action lawsuits.

117.   On May 9, 2017, Hershberger sold 15,000 shares of his Company common stock (about 10% of his holdings) outside the scope of his 10(b)(5)-1 trading plan at an average price of $20.37 per share, pocketing more than $300,000 in proceeds.

118.   On June 1, 2017, FLOIR denied the TPA Application.  On August 31, 2017 and September 1, 2017, Hershberger sold a total of 17,769 shares of his Company common stock at an average price of $31.42 per share for proceeds of $558,384.  On September 11, 2017, the *Seeking Alpha Report* was published disclosing the truth about the Company's regulatory problems.  Over the course of the day, the Company's share price lost more than a fifth of its value, falling dramatically from an opening price of $29.90 per share to a closing price of $23.35 per share.  The next day, the Company's share price fell even further, opening at $20.55 per share and closing at $19.75per share – a loss of more than 40% of the value that Hershberger sold his stock for two weeks earlier.

## DAMAGES TO THE COMPANY

119.    As a direct and proximate result of Defendants' conduct, the Company has lost and expended, and will lose and expend, many millions of dollars.

120.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, and Chief of Product Innovation, legal fees associated with the Consumer Class Actions filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.    Such costs include, but are not limited to, those incurred related to the investigations arising from the Regulatory Misconduct and Sales Misconduct, including by forty-three States.

122.    Such costs include, but are not limited to, the $140,000 fine assessed against the Company by the FLOIR for conducting business as an insurance administrator prior to submitting a license application therefor.

123.    Such losses include, but are not limited to, approximately $20,460 that the Company overpaid, at the direction of Defendants, for its repurchases of its own stock at artificially inflated prices.

124.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to Defendants who breached their fiduciary duties to the Company.

125.    As a direct and proximate result of the Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

126.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

127.   Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

128.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.   Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

129.   During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.   Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

130.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

131.   A pre-suit demand on the Board is futile and, therefore, excused.   At the time of filing of this action, the Board consists of the following eight individuals: Avery, Barkett, Gabos, Kosloske, Murley, Southwell, and Wang (the "Director-Defendants") and non-party John

Fitchthorn (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight directors who were on the Board at the time this action was commenced.

132.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

133.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

134.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

135.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Southwell**

136.    Defendant Southwell is not disinterested or independent, and therefore, is incapable of considering demand because Southwell (as President and CEO of the Company) is

an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Southwell cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

137.    This lack of independence and financial benefits received by Southwell renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

138.    In addition, Southwell is a defendant in the securities class action *In re Health Insurance Innovations Securities Litigation*, Master Case No.: 8:17-cv-02186-EAK-MAP (M.D. Fla.) ("Securities Class Action").

139.    As such, Defendant Southwell cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

140.    As a trusted Company director, Southwell conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Southwell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Kosloske**

141.    Defendant Koloske is not disinterested or independent, and therefore, is incapable of considering demand because Koloske (as CEO from 2008 to 2015 and served as the

Company's Chief of Product Innovation) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Koloske cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

142.    This lack of independence and financial benefits received by Koloske renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

143.    In addition, Koloske is a defendant in the Securities Class Action.

144.    As such, Defendant Koloske cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

145.    In addition, Kosloske's wife is employed by the Company as Chief Broker Compliance Officer, which she receives a substantial compensation for her position, including $262,445 in 2016.  As a result, Kosloske is unable to evaluate demand with independence, as he may fear retaliation against his wife should he grant any demand.

146.    As a trusted Company director, Koloske conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Koloske breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Wang**

147.    Defendant Wang is not disinterested or independent, and therefore, is incapable of considering demand because Wang (as the Company's Chief Technology Officer) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Wang cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

148.    This lack of independence and financial benefits received by Wang renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

149.    As a trusted Company director, Wang conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Wang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendants Gabos, Murley, and Barkett**

150.    The Company's Audit Committee is presently comprised of Defendants Gabos, Murley and Barkett.

151.    The Director Defendants who served on the Audit Committee are not disinterested and independent. Pursuant to the Company's Audit Committee Charter, the purposes of the Committee are to assist the Board in fulfilling its oversight responsibilities related to: (i) the

integrity of the Company's financial statements; (ii) the Company's internal accounting and financial reporting controls; (iii) the adequacy of and compliance with the Company's disclosure controls and procedures; (iv) the Company's compliance with legal and regulatory requirements; (iv) the Company's risk assessment and risk management regarding financial reporting and legal compliance; (v) the registered public accounting firm's qualifications and independence; and (vi) the performance of the registered public accounting firm.

152. Defendants Gabos, Murley and Barkett, as members of the Audit Committee, during the time each of them served, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein. Thus, these Defendants also face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

## AGAINST DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

153. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154. Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

155. Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

156.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

158.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

## AGAINST DEFENDANTS FOR WASTE OF CORPORATE ASSETS

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

161.    As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers;

(ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

162.    As a result of the waste of corporate assets, Defendants are liable to the Company.

163.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT III**

**AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 10(b)
OF THE EXCHANGE ACT AND SEC RULE 10(b)-5**

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    During the Relevant Period, Defendants disseminated or approved public statements that misrepresented or failed to disclose that (a) the Company had unsuccessfully applied for its critically important TPA Application with FLOIR due to, *inter alia*, the state's discovery of undisclosed legal actions against Company insiders; (b) the Company privately warned FLOIR of the anticipated "domino effect" that the rejection would cause, by which the Company would subsequently either lose or be denied licenses in other states; (c) the Company was omitting material information from FLOIR and disregarding FLOIR's instructions to complete the TPA Application; (d) the TPA license denial was substantially harming the Company's ability to conduct its core business operations; (e) the Company had been accused of fraud by insurance regulators in Montana, and had suffered negative regulatory actions there as a result of the Company's misconduct; and (f) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

166.    With the price of its common stock trading at artificially inflated prices due to Defendants' misconduct, Defendants caused the Company to repurchase thousands of dollars of its own shares on the open market at artificially inflated prices, damaging the Company.

167.    Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while five of them engaged in insider sales, netting proceeds of over $50.7 million.  Over 11,627 shares of the Company's common stock were repurchased during March 2017 for almost $185,000. As the Company stock was actually only worth $14.10 per share, the price at which it was trading on September 28, 2017, the Company overpaid approximately $20,463 in total.

168.    As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10(b)-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10(b)-5.

**COUNT IV**

**AGAINST DEFENDANTS FOR**
**<u>VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT</u>**

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    Defendants, by virtue of their positions with the Company and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of § 20 (a) of the Exchange Act.  Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

## COUNT V

## AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14(a)-9

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.    SEC Rule 14(a)-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174.    Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14(a)-9 because Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the Regulatory Misconduct and Sales Misconduct and the false and misleading statements made by Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

175.    The 2017 Proxy Statement also made reference to the Company's Code of Business Conduct and Ethics. The Code required the Company and Defendants to abide by

relevant laws and statutes, make accurate and non-misleading public disclosures, deal fairly with the public, and not engage in insider trading.  By engaging in the Regulatory Misconduct and Sales Misconduct, issuing false and misleading statements to the investing public, and insider trading, Defendants violated the Code of Conduct. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Business Conduct and Ethics were being violated.

176.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

177.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

178.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxy.

## COUNT VI

## AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company in the form of salaries, bonuses, and other forms of compensation.

181.    Plaintiff, as a shareholder and representatives of the Company, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 26, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com